IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LIMESTONE DEVELOPMENT CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VILLAGE OF LEMONT, | ) | No. 05 C 4390 |
| K.A. STEEL CHEMICALS, INC., | ) | |
| JOHN PIAZZA, | ) | |
| RICHARD A. KWASNESKI, | ) | Judge Virginia M. Kendall |
| STEVEN JONES, | ) | |
| JOHN D. ANTONOPOULOS, | ) | |
| ROBERT PORTER, AND | ) | |
| DANIEL FIELDING, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Limestone Development Corporation ("Plaintiff" or "LDC") has brought suit

against eight Defendants: Village of Lemont, an Illinois municipal corporation ("Village of

Lemont"); K.A. Steel Chemicals, Inc., a Delaware Corporation doing business in Illinois ("K.A.

Steel"); John Piazza, individually and in his official capacity as the current Mayor of the Village of

Lemont ("Piazza"); Richard A. Kwasneski, individually and in his official capacity as the former

Mayor of the Village of Lemont ("Kwasneski"); Steven Jones, individually and in his official

capacity as Administrator of the Village of Lemont ("Jones"); John D. Antonopoulos, individually

and in his official capacity as Attorney for the Village of Lemont ("Antonopoulos"); Robert Porter,

individually and in his capacity as Administrator of the Lemont Park District ("Porter"); and Daniel

Fielding, individually and in his official capacity as an employee of the Village of Lemont

("Fielding").

First, Plaintiff alleges that Defendants Piazza, Kwasneski, Jones, Antonopoulos, and Porter violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d) ("RICO"). Specifically, LDC alleges that Defendants Piazza, Kwasneski, Jones, Antonopoulos, and Porter entered into an agreement to conduct an enterprise through a pattern of racketeering activity in order to damage LDC's business and property, and to wrongfully acquire LDC's property by delaying or thwarting LDC's efforts to develop and/or market its property so that LDC would be forced by its lenders to sell the property at less than fair market value. Am. Cmplt. Count I at ¶¶ 1-78.[1]

Second, Plaintiff alleges that all Defendants (except Porter) conspired to and did in fact deny LDC the equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983, by treating LDC differently from all other property owners in the Village of Lemont who owned property on public highways (the "Equal Protection Defendants"). Specifically, LDC alleges that the Defendants: (1) failed to maintain the public highway accessing LDC's property in a condition safe for vehicular traffic, and (2) permitted K.A. Steel to maintain a guardhouse/weigh station capable of blocking traffic on the public highway accessing LDC's property. Am. Cmplt. Count II at ¶¶ 1-30.

Third, Plaintiff alleges a pendant state law claim for Tortious Interference with Business Expectancy and Conspiracy to Interfere with Business Expectancy against K.A. Steel. Plaintiff originally brought this claim against all Defendants except Porter, but withdrew the claim against the Village of Lemont and all the Village employees as part of Plaintiff's Response to the Lemont

---

[1] LDC pleaded its Amended Complaint by count, with the numbered paragraphs beginning again at the start of each new count. Therefore, cites to the Amended Complaint include the number of the Count as well as the number of the relevant paragraph.

Motion to Dismiss. Therefore, the state law tortious interference and conspiracy claim remains solely against K.A. Steel. Am. Cmplt. Count III at ¶¶ 1-26; Pltf. Resp. to Lemont at 9.

Plaintiff filed its original complaint with this Court on August 1, 2005, and subsequently filed an Amended Complaint on April 14, 2006. Defendants move to dismiss Plaintiff's Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants Village of Lemont, Piazza, Kwasneski, Jones, and Antonopoulos, together with K.A. Steel, move to dismiss all claims as barred by their respective statutes of limitations. Alternatively, Defendants Village of Lemont, Piazza, Kwasneski, Jones, Antonopoulos, and Porter move to dismiss each allegation for failure to state a claim.

For reasons state below, Defendants' motion to dismiss the Amended Complaint is granted in its entirety.

### Plaintiff's Allegations

In 1989, Plaintiff purchased two parcels of land, totaling approximately 55 acres, bordering the Illinois and Michigan Canal in Cook County, Illinois, near the Village of Lemont. The northern parcel was approximately 26.1 acres in size and bordered the canal to the north; the other parcel, to the south of the canal, was approximately 29 acres. Am. Cmplt., Count I at ¶ 9. LDC approached the Metropolitan Water Reclamation District ("MWRD") about developing the north parcel of LDC's property as a marina. *Id.* at ¶ 24. LDC required a lease for property that would permit the construction of a canal that would connect a lake on LDC's property (where the marina was to be located) to a Sanitary and Ship Canal. *Id.*

**Allegations against the Village of Lemont and Village Employees**

In 1992, LDC approached the Lemont Park District to form a joint venture that would ultimately allow LDC and the Lemont Park District to lease the necessary land from the MWRD at

a significantly reduced yearly fee in order to implement LDC's marina development plans (the "Joint Venture").[2] *Id.* at ¶¶ 25–28. At that time, Defendant Porter was the Administrator of the Lemont Park District. Plaintiff alleges that the conspiracy against it by Defendants Porter, Antonopolous, Kwasneski, and Jones, (and later Piazza,) all employees of the Village of Lemont, began when Plaintiff approached the Lemont Park District about the Joint Venture. *Id.* at ¶¶ 10-12, 29.

In 1993, LDC became delinquent on its real estate taxes. Defendants Porter, Antonopolous, Kwasneski, and Jones conspired to acquire LDC's property by making a "no cash bid" on LDC's property for the delinquent taxes. *Id.* at ¶ 17. Defendants misrepresented to Cook County that LDC's property in question was not encumbered by pending litigation concerning easement access to the property. *Id.* at ¶ 18; *see* "Easement Access Litigation" below. LDC redeemed the taxes and prevented the acquisition. *Id.* at ¶¶ 19, 20, 22.

In 1995, Porter mailed to LDC a letter concerning the possible Joint Venture, in which he re-affirmed the Park District's interest in the proposed Joint Venture and indicated that LDC would pay the legal and development expenses of the proposed marina project. *Id.* at ¶ 35; Ex. B. But LDC alleges that the Lemont Park District in fact had no intention of participating in the Joint Venture with LDC, and that Porter intentionally feigned interest to delay and thwart LDC's development of its property. *Id.* at ¶¶ 30–34.

In 1999, the Village of Lemont prepared an inaccurate appraisal of LDC's property. Am. Cmplt. at ¶¶ 41, 42. The appraisal was: (i) prepared under an erroneous assumption of LDC's available uses of the access road to its property resulting from previous easement access litigation,

---

[2] The Lemont Park District had the right to lease the property from the MWRD at a cost of $1.00 per year as opposed to $56,000 per year had LDC leased the property on its own.

(ii) did not take into account that LDC could improve the value of its property by removing certain limestone "tailings," and (iii) inaccurately included more "lake area" and less land area in the northern parcel of land. *Id.* at ¶ 42. Antonopolous, Jones, Kwasneski, and Porter knew that the appraisal was inaccurate in the foregoing respects. *Id.*

In 2000, Defendant Jones mailed an initial purchase offer based on the faulty appraisal to the land trustee holding legal title to LDC's property. When LDC declined the offer of sale, Jones mailed several requests for monies to be issued pursuant to a grant agreement with the Illinois Department of Commerce & Community Affairs. *Id.* at ¶¶ 52–58. With the inaccurate appraisal in hand and using the monies from the grant agreement, Defendants Antonopolous, Jones, and Kwasneski, initiated an eminent domain proceeding against LDC's northern parcel. *Id.* at ¶ 44. The eminent domain proceeding was a sham that Defendants had no intention to pursue; Defendants brought the proceeding only to encumber the property so that, in LDC's words, "Limestone would fail, its lenders would commence foreclosure, and either the Village of Lemont or the Lemont Park District could acquire the property for less than fair market value." *Id.* The eminent domain proceeding, filed in mid-2000, was voluntarily dismissed by the Village of Lemont in 2002. *Id.* at ¶ 59.

In 2001, Defendant Piazza, in his official capacity as the newly elected Mayor of the Village of Lemont, joined the conspiracy and helped continue the interference with LDC's business expectancy. Am. Cmplt. Count II at ¶ 20.

In early 2003, Defendant Piazza, the current Mayor of the Village of Lemont, with the agreement and assistance of Antonopolous, Porter, Kwasneski, and Jones, made false public representations that the Village of Lemont controlled or owned LDC's property by mailing some 5000 copies of the "Village News" to residents of Lemont showing LDC's property on a map and

indicating that the Village of Lemont had taken certain actions to develop portions of the property. Am. Cmplt. Count I at ¶¶ 60, 64–68. The misrepresentations in the Village News led the public and potential purchasers of LDC's property to believe that the property was owned or controlled by the Village of Lemont and subsequently impaired LDC's attempts to market and sell its property. *Id.* at ¶ 69.

Also in 2003, Porter communicated via email with Edward Andrysiak, an agent of LDC, representing that a proper appraisal of LDC's property would be performed and serve as the basis of negotiations for a purchase of LDC's property by either the Lemont Park District or Lemont Township. *Id.* at ¶ 70. But again, Defendants in fact had no intention of performing a new and correct appraisal, and instead only intended that their misrepresentations would delay LDC's development and/or marketing of its property. *Id.* at ¶ 71.

**Allegations Against K.A. Steel**

In January 1999, the Village of Lemont annexed the northern parcel of LDC's property, which until that time had been located in a different municipality. Am. Cmplt., Count II at ¶ 18. Beginning in November 1999 the Lemont Defendants omitted to perform necessary maintenance on the public road accessing LDC's property, although the Village performed such maintenance on all other public highways within its jurisdiction. *Id.* at ¶ 21. From some time "shortly after the conspiracy, combination, and agreement was entered into" until early 2004, the Village of Lemont allowed Defendant K.A. Steel to maintain a guardhouse/weigh station on the same public highway accessing Plaintiff's property, although it did not allow or permit any similar guardhouse/weigh station on a public highway within its jurisdiction. *Id.* at ¶ 22. K.A. Steel maintained its guardhouse/weigh station 24 hours a day, 7 days a week; however, Plaintiff does not allege any instances of denied access to its property during this time. *Id.* at ¶ 23. Defendants' actions were

intentionally designed to interfere with and prevent LDC from effectively marketing its property for sale and from receiving full and fair market value. *Id.* at ¶¶ 27–30.

Near the end of 2003, LDC entered into a contract with Morgan Builders, Inc., to sell its property for below fair market value. *Id.* at ¶¶ 24, 30. After LDC signed the contract with Morgan Builders, Defendants became aware of the sale and only then began to repair and maintain the access road to LDC's (former) property. *Id.* at ¶¶ 24–25. Additionally, sometime after the signing of the contract between LDC and Morgan Builders, K.A. Steel removed its guardhouse/weigh station from the public highway. *Id.* at ¶ 26.

### Previous Litigation

#### LDC & Village of Lemont Easement Access Litigation

In 1992, LDC filed suit in the Circuit Court of Cook County against the Village of Lemont and K.A. Steel concerning use of an unimproved road that provided the only land access to LDC's northern parcel. One section of the road was owned by K.A. Steel, and another section crossed a 90-foot reserve strip of land owned by the Village of Lemont. *Limestone Dev. Corp. v. Vill. of Lemont*, 672 N.E.2d 763, 766 (Ill. App. Ct. 1996) ("*Limestone I*"). In 1990, LDC brought in heavy equipment to widen and clear the road for purposes of developing a marina. *Id.* The Village of Lemont notified LDC of their concerns regarding the safety of the road and told LDC they had no permission to use the road accessing the property. *Id.* K.A. Steel also prohibited LDC's use of the road. *Id.* However, LDC continued to use the road without the Village's permission or knowledge. *Id.* The Village of Lemont finally prohibited LDC from using the road by posting a stop work order and adding a locked gate that crossed the road. *Id.* LDC filed suit for declaratory, injunctive, and monetary relief against the Village for wrongful denial of access to LDC's property.

In late 1994, LDC filed an emergency petition for preliminary injunction. *Id.* at 767. A Cook County judge granted a preliminary injunction to LDC and found that LDC had a legal right to unfettered use of the access road by virtue of prescription, implied easement, and statutory and common law dedication. *Id.* at 767. On appeal from the preliminary injunction, the Illinois Appellate Court affirmed that LDC had made a sufficient showing for a preliminary injunction on grounds that the access road was a prescriptive easement, but reversed the lower court's determination that LDC should have unfettered access to the road to develop the marina because the prescriptive easement extended only to recreational use. *Id.* at 769. The Illinois Appellate Court also found an insufficient showing for preliminary injunction purposes that LDC had an implied easement or a statutory or common law dedication. *Id.* at 769-71.

In 1997, on remand, a Cook County judge found after full hearing that LDC had established an implied easement by necessity, but for non-commercial uses only. *See Limestone Dev. Corp. v. Vill. of Lemont*, No. 1-97-3711, *2–3 (Ill. App. Ct. 1998) ("*Limestone II*") (unpublished, attached as Def. Ex. 6). The trial court found that LDC could not establish on the merits a public highway by prescription or common law dedication. *Id.* On direct appeal, the Appellate Court held that LDC had established an implied easement by necessity, the scope of which included uses that were reasonably necessary for the full enjoyment of the property. *Id.* at *20–23. While the road could be used for "commercial activities," the Court held that LDC did not have an unqualified or unrestricted right to use the access road. *Id.* at *23-25. More specifically, LDC could not use the access road to pursue its commercial marina development as planned, because the planned marina development would unduly burden the Village of Lemont's and K.A. Steel's use and enjoyment of their respective properties. *Id.* at *23–25. The Illinois Appellate Court did not reach the issue of

future commercial use of the canal road by LDC for purposes other than the development of a marina. *Id*. at *25.

<u>Mandamus Suit Over Road Maintenance</u>

In 1999, LDC sued the Village of Lemont and the Lemont Public Works Director, Fielding, for a writ of mandamus. Mandamus Cmplt., Lemont Def. Ex. 7. LDC alleged that the road accessing LDC's property (the same road subject to the easement access litigation above) was unsafe for vehicular traffic and that the Village and Fielding failed to maintain the access road consistent with the Appellate Court's opinion. *Id.* LDC further alleged that "[d]ue to Lemont and Fielding's failure to perform their duty with respect to the Canal Road, the rights of Plaintiff . . . have been materially harmed." *Id.* at ¶ 17. Defendants' Motion for Summary Judgment on the writ of mandamus was granted. *See* Lemont Def. Ex. 8.

**Standard of Review**

The court may dismiss claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *See McCullah v. Gadert*, 344 F.3d 655, 657 (7th Cir. 2003). On a motion to dismiss, the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims," *Cole v. U.S. Capital*, 289 F.3d 719, 724 (7th Cir. 2004), *citing Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), and a Rule 12(b)(6) motion will not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957). However, if a plaintiff "pleads facts that show its suit [is]

barred by a statute of limitations, it may plead itself out of court under a Rule 12(b)(6) analysis." *Whirlpool Fin. Corp. v. GN Holdings, Inc.,* 67 F.3d 605, 608 (7th Cir. 1995).

In response to an ordinary 12(b)(6) motion, a court limits is review to the allegations in the complaint and any attachments. If a court considers matters outside the pleadings, federal procedural rules generally require that the motion be treated as one for summary judgment. *See* Fed. R. Civ. P. 12(b). Under this converted motion, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Id.* However, the courts have crafted a narrow exception to this rule to permit a district court to take judicial notice of matters of public record without converting a motion for failure to state a claim into a motion for summary judgment. *See United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir.1991); *see also Doherty v. City of Chicago*, 75 F.3d 318, 325 n. 4 (7th Cir.1996). This exception has allowed courts to avoid unnecessary proceedings when an undisputed fact in the public record establishes that the plaintiff cannot satisfy the 12(b)(6) standard. *See General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997).

A court may take judicial notice of an adjudicative fact that is both "not subject to reasonable dispute" and either: (1) "generally known within the territorial jurisdiction of the trial court" or (2) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) ("In order for a fact to be judicially noticed, indisputability is a prerequisite."). Generally, court records are appropriate subjects for judicial notice because they are sources "whose accuracy cannot reasonably be questioned." *General Elec.*, 128 F.3d at 1081.

Additionally, a court has the power to "take judicial notice of 'proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to

matters at issue.'  This is true even though those proceedings were not made a part of the record before the district court."  *United States v. Hope*, 906 F.2d 254, 260 n.1 (7th Cir. 1990) (citations omitted); *see also Henson v. CSC Credit Svcs.*, 29 F.3d 280, 284 (7th Cir. 1994) (confirming that court documents from state proceeding are noticeable).  Judicial notice is premised on the concept that certain facts or propositions exist which a court may accept as true without requiring additional proof from the opposing parties.  *General Elec.*, 128 F.3d at 1081.  Therefore, this Court is within its power to take judicial notice of LDC's previous state court litigation, including its writ of mandamus suit filed in 1999.[3]

## Discussion

## Count I – RICO Claim

1.    Statute of Limitations

The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C §§ 1961–1968 makes it unlawful "to conduct" an "enterprise's affairs through a pattern of racketeering activity," where "racketeering" is defined as behavior that violates certain enumerated federal statutes or state laws addressing specified topics and bearing specified penalties.  18 U.S.C. §§ 1962(c); 1961(1).   In order to qualify as a "pattern" under RICO, a plaintiff must show "at least two acts of racketeering activity . . . the last of which occurred within 10 years . . . after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5).  The RICO statute allows for civil actions in which "any person injured in his business or property" by a RICO violation may seek treble damages and

---

[3] This Court limits its consideration of the previous mandamus litigation involving LDC and the Village of Lemont to: (i) notice of the suit's filing, (ii) Plaintiff's allegations therein, and (iii) the outcome determined by the Cook County Circuit Court.  The Court does not take the previous mandamus litigation  for the truth asserted in the pleadings or final order.  *See General Elec.*, 128 F.3d at 1081, 1082 n. 6  (advocating caution in the use of judicial notice and stating that "courts generally cannot take notice of findings of fact from other proceedings for the truth asserted therein because these findings are disputable and usually are disputed.").

attorney's fees.  18 U.S.C. § 1964(c).  RICO also provides that conspiracy to violate any of the provisions of 18 U.S.C. § 1962 is actionable under the statute.  18 U.S.C. § 1962(d).

RICO does not provide an express statute of limitations for actions brought under its civil enforcement provision.  However, the Supreme Court has held that civil RICO claims should be governed by the same four-year statute of limitations period as governs the closely related claim under the Clayton Act.  *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,* 483 U.S. 143, 150-56 (1987) (analyzing the statutory relationship and legislative history of 18 U.S.C. § 1964 and the Clayton Act, 15. U.S.C. § 15).

The four-year RICO limitations period begins to accrue from the date of "discovery of the injury, not from discovery of the other elements of a claim."  *Rotella v. Wood,* 528 U.S. 549, 555 (2000).; *accord Perry v. Globe Auto Recycling, Inc*., 227 F.3d 950, 954 (7th Cir. 2000).  "There must, of course, be a pattern of racketeering before the plaintiff's RICO claim accrues, and this requirement might delay accrual until after the plaintiff discovers her injury."  *McCool v. Strata Oil Co*., 972 F.2d 1452, 1465 (7th Cir. 1992).  However, "the pattern element of RICO gives rise to the cause of action, but is not the injury itself."  *Id*.  Therefore, the RICO statute of limitations begins to accrue when both a "pattern of racketeering"- i.e. two predicate acts - has occurred, and when the plaintiff knows or should know he or she was injured.

2.    Predicate Acts

Plaintiff alleges that in furtherance of the RICO enterprise, the RICO Defendants committed acts of mail and wire fraud on several occasions over a ten-year period.  *See* 18 U.S.C. § 1341 (defining elements of mail and wire fraud).  The first predicate act pleaded by Plaintiff is a 1993 letter sent through United States mails by Defendant Antonopolous  to the Village of Lemont. The letter allegedly confirmed that Antonopolous made a purposeful and intentional misrepresentation

to Cook County in regard to the Lemont Park District's "no cash bid" effort to purchase LDC's delinquent taxes and acquire the property.

Plaintiff alleges a second count of mail fraud in 1995, when Defendant Porter mailed a letter to LDC, via the United States Postal Service, that fraudulently conveyed the Lemont Park District's interest in pursuing the Joint Venture with LDC to develop a marina on LDC's property. The letter stated that a draft agreement submitted by LDC had been forwarded to the Park District's attorney, and that a $1,500.00 escrow account (paid for by LDC) would be required for additional legal fees.

Next, Plaintiff alleges five additional instances of mail fraud allegedly occurring between late 1999 and July 2000. The mailings concerned requests by Defendant Jones to the Illinois Department of Commerce and Community Affairs for grant money to pursue an eminent domain proceeding against LDC for the northern parcel of property. Another letter, sent by Defendant Antonopolous to LDC's land trustee on March 14, 2000, offered to purchase LDC's northern parcel for below market value and included in the mailing an appraisal of the LDC property that LDC alleges was inaccurate and undervalued.

Finally, Plaintiff alleges two collections of violations of mail and wire fraud in 2003. First, Plaintiff alleges in excess of five thousand counts of Mail Fraud stemming from a March 2003 "Village News" letter sent to the citizens of Lemont Township that allegedly contained misleading and false information about the actual title holder to the property. Second, Plaintiff pleads seven counts of wire fraud occurring between May and July 2003, each count an e-mail communication from Defendant Porter to LDC's agent intentionally misrepresenting that a proper appraisal of the property was being undertaken and would serve as a basis for negotiations for the sale of LDC's property to the Lemont Park District or Lemont Township.

The Court views LDC's allegations in the light most favorable to Plaintiff and accepts for purposes of this analysis that each alleged count of mail or wire fraud would, indeed, support Plaintiff's allegation of a predicate act of "racketeering" under RICO. The Plaintiff's cause of action for a RICO claim accrued as early as 1995, the second predicate act alleged by Plaintiff. Plaintiff pleaded that the first act of mail fraud occurred in 1993, when Defendant Antonopolous mailed a letter in furtherance of the "enterprise's" scheme to defraud by purchasing LDC's delinquent taxes. The second act, a necessary predicate act in establishing a sustainable RICO claim, occurred in 1995, when Defendant Porter mailed to LDC an intentionally false and misleading letter in furtherance of the Defendants' scheme to defraud.

Therefore, a pattern of racketeering activity existed as of the second predicate act of racketeering - namely, October 24, 1995. For the sake of argument, the very latest that a pattern of racketeering existed was in the summer of 2000 when Defendants Jones and Antonopolous mailed several intentionally false and misleading letters to the land trustee and Department of Commerce and Community Affairs pursuant to Defendants' eminent domain proceeding. At that point, several acts had taken place, two of which involved allegedly fraudulent letters sent directly to Plaintiff.

The statute of limitations period does not begin to run solely when the underlying RICO cause of action becomes legally actionable. To begin the statute of limitations period in a RICO case, the Plaintiff must also suffer injury and become aware of his or her injury, or should have become aware of such injury through reasonable diligence. *McCool*, 972 F.2d at 1464–65.

3.      LDC's Injury

Plaintiff arguably discovered the injury that has been pleaded in this suit as early as 1992, prior to the predicate acts alleged to have caused the injury. In 1992, LDC filed its first suit in state court alleging that the Village of Lemont and K.A. Steel were "wrongfully denying LDC access to

its property by maintaining a locked gate on the Lemont Road." *Limestone I*, 672 N.E.2d at 766. LDC not only sought injunctive and declaratory relief in that action, but also claimed monetary damages for the same injury, stemming from the Village of Lemont's conduct, as has been claimed in this case. *Id*. In the 1992 action, LDC claimed that "Defendants were wrongfully denying [LDC] use of a roadway to access its property and thereby were impeding the commencement of a large-scale development . . . [and LDC was seeking] monetary damages against Lemont for tortious interference with prospective economic advantage." *Limestone II* at *1. Here, LDC alleges that the RICO enterprise illegally sought to delay or thwart LDC's efforts to develop and/or market its property.

Because the alleged conduct of the RICO Defendants in the 1992 suit is the same as that alleged here, Plaintiff knew of its injury as early as 1992 when it filed suit in state court. *See Saldino v. Redisi*, 2004 WL 2075125 (N.D. Ill., Aug. 30, 2004) (dismissing a civil RICO claim as time-barred because the plaintiff knew or should have known of a RICO injury based on claims filed in state court dating back to years before the federal litigation and alleging the same or similar conduct). Because the claims against Defendants in the instant case are essentially the same as those of the previous litigation, LDC knew about its injury in 1992 when it filed suit against the Village of Lemont for interfering with development of its property; LDC knew about the nature of the injury of which it now complains even before the second predicate act in 1995.

The 1999 suit for writ of mandamus indicates that LDC continued to be aware of the injury caused by the Village of Lemont, and be aware of the injury after the predicate acts occurred. In the 1999 suit, LDC added Fielding as a defendant. (Mandamus Cmplt., Lemont Def. Ex. 7.) In addition to alleging failure to maintain the access road, LDC further alleged that "[d]ue to Lemont and Fielding's failure to perform their duty with respect to the Canal Road, the rights of Plaintiff . . .

have been materially harmed." *Id.* at ¶ 17. Although the factual allegations in the writ of mandamus differ from the RICO claim at issue here and are not relied upon by the court, the relief sought by Plaintiff via the writ of mandamus serves as further support of Plaintiff's knowledge of injury at the hands of at least two of the Defendants complained of in the instant case.

Even taking the most generous review of the predicate acts into account as the date of establishment of a cause of action, Plaintiff unquestionably knew or should have known about its injury by 2000, when Defendants used an allegedly inaccurate appraisal of Plaintiff's property to initiate an eminent domain proceeding. Plaintiff pleaded specifically that on March 14, 2000, the land trustee holding title to the LDC property received a below market value offer from the Village of Lemont and Antonopolous based on the faulty appraisal. At that point, LDC knew about injury to value of the property underlying the 1992 suit, the same injury underlying the 1999 mandamus, and knew about the same injury a third time when Defendants attempted to acquire LDC's property at less than fair market value via an eminent domain proceeding. Whether LDC knew a RICO enterprise existed at this point is irrelevant, because "a RICO claim accrues when the Plaintiff discovers her injury even if she has not yet discovered the pattern of racketeering." *McCool*, 972 F.2d at 1465.

Plaintiff claims that it did not know it was injured until 2002, on the theory that, in LDC's words, "after all, if the eminent domain proceeding had gone to judgment, Limestone would have received fair market value for its property." Pltf. Lemont Resp. at 5-6. But the outcome of the eminent domain proceeding is not relevant to the date of discovery of injury; LDC knew that the appraised value was less than fair market value at the outset of the eminent domain proceeding in 2000, and that the faulty appraisal served as the basis for the government's eminent domain proceeding. Because LDC believed that the appraisal of their property was faulty and that the

initiation of an eminent domain suit to acquire the property based on the appraisal would tie up the property for months, if not years, LDC knew that the Defendants injured LDC's ability to market or sell their property when they received the faulty appraisal, or at the latest, when the suit was officially filed in 2000.

Therefore, LDC provided public notice of its injury in 1992 when it filed its state court suit against the Village of Lemont for interference with its development of the property at issue. Even assuming that LDC did not know about the injury in 1992, Plaintiff knew about its injury in 1999 when it filed for a writ of mandamus concerning the access road. And, Plaintiff further alleged that it knew about the injury in 2000 when Defendants filed an eminent domain proceeding against Plaintiff in order to encumber the property and delay development.

As discussed above, a "pattern of racketeering activity" existed, at the latest, by the summer of 2000 when Defendants used the U.S. mails in furtherance of the RICO enterprise and in connection with the eminent domain proceeding. And Plaintiff knew or should have known about the injury claim, at the latest, by 2000 when Defendants used the allegedly faulty appraisal to initiate the eminent domain proceeding against Plaintiff. Therefore, the four-year statute of limitations began to run at the latest in 2000. But Plaintiff did not file its original complaint until August 1, 2005, after the four-year limitations had expired. Therefore, Plaintiff's RICO claim against Defendants Piazza, Kwasneski, Jones, Antonopoulos, and Porter is time-barred by the statute of limitations and is hereby dismissed.

4. *McCool's* Separate Accrual Rule

Finally, Plaintiff alleges that the 2003 acts by Defendants trigger the "separate accrual rule" for statute of limitations purposes. *McCool* articulated the "separate accrual rule" in cases where certain predicate acts injuring the Plaintiff were committed within the four-year limitations period

17

prior to the filing of the complaint. In those cases, the statute of limitations would not bar a plaintiff's RICO claims to the extent that he is seeking damages for the injuries caused by *those* predicate acts. *See McCool*, 972 F.2d at 1465. But "the plaintiff cannot use an independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 181 (1997). The separate accrual rule applies to new events by the enterprise that lead to new injuries. *See McCool*, 972 F. 3d at 1465 n.10.

Here, although Plaintiff alleges different conduct on part of the Defendants in 2003 (specifically, mailing of the Village News letter and several email transmissions between Porter and LDC), the injury was the same: "delaying or thwarting Limestone's development and/or marketing of its property so that Limestone would be forced to sell the property at less than fair market value." Am. Cmplt. Count I at ¶ 10. This is the same injury as Plaintiff has been claiming since its first lawsuit in state court. *See Klehr*, 521 U.S. at 190 (denying relief under the separate accrual rule when plaintiff could not show "how any new act could have caused them harm over and above the harm that the earlier acts caused"). Because the 2003 mail and wire fraud acts constitute part of the same injury alleged throughout Plaintiff's Amended Complaint, *McCool's* separate accrual rule is inapplicable. Plaintiff's RICO claim in Count I of the Amended Complaint is dismissed as time-barred.

       5.      <u>Failure to State a RICO Claim</u>

In the alternative to dismissal on statute of limitations grounds, Defendants Piazza, Jones, Kwasneski, Antonopolous, and Porter move to dismiss the Amended Complaint because Plaintiff fails to state a claim upon which relief may be granted. Specifically, Defendants claim that Plaintiff fails to allege: (1) a RICO enterprise, (2) a RICO pattern, (3) racketeering activity, and (4) a

conspiracy under Section 1962(d).

Section 1962(c) of the RICO statute provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions" of the RICO statute. 18 U.S.C. § 1962(d). To state a claim for a RICO violation, Plaintiff must allege a cognizable injury to its business or property resulting from: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006), *citing Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

RICO defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A RICO enterprise must have "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical consensual decision making." *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990). A plaintiff cannot establish structure by defining the enterprise through what it supposedly does, and must offer some sign of a "command structure." *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000). The enterprise must have some continuity and some differentiation of the roles within it. *See Burdett v. Miller*, 957 F.2d 1375, 1379 (7th Cir. 1992).

Allegations of fraud in a civil RICO complaint are subject to the heightened pleading standard, which requires a plaintiff to plead all averments of fraud with particularity. Fed. R. Civ. P. 9(b); *see Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 726 (7th Cir. 1998). In alleging a RICO pattern, liability is limited to persons who have "personally committed" at least two predicate acts

of racketeering. *See Dudley Enterprises, Inc. v. Palmer Corp.,* 822 F. Supp. 496, 502 (N.D. Ill. 1993). Accordingly, a RICO Plaintiff must, at a minimum, describe the two predicate acts of fraud by each Defendant with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations. *See Slaney v. The Int'l. Amateur Athletic Federation,* 244 F.3d 580, 597 (7th Cir. 2001).

In each act of mail and wire fraud Plaintiff pleads the date, place, method, and identity of the party to the fraudulent communication. Likewise, Plaintiff adequately alleges at least two predicate acts by each Defendant from 1993 to 2003. But although Plaintiff takes care to plead the actual predicate acts with the required specificity, Plaintiff makes no allegations as to an enterprise existing separate from the predicate acts themselves, or allegations of a structure and hierarchy.. Plaintiff alleges that "the enterprise was an association of, between, and among the Village of Lemont, the Lemont Park District, and Lemont Township and that members of the Lemont Park District and the Village of Lemont met, communicated, or conspired to defraud Plaintiff." Am. Cmplt. Count I at ¶ 14. While government offices can serve as RICO enterprises, Plaintiff's allegations are against the five Defendants in their individual capacities; Plaintiff does not connect the acts of these individuals to a structure or operation within the existing structure of the various offices. *See Jennings*, 910 F.2d at 1440 (allegations that law enforcement personnel did various things does not create an "enterprise" when the allegations did not include the structure of the organization in which they were employed but rather alleged that the organization "supported" their efforts).

Because Plaintiff cannot establish the structure necessary to allege a RICO "enterprise" by defining the enterprise through what its alleged actions, LDC does not sufficiently allege a RICO

enterprise. *See Jennings*, 910 F.2d at 1440 ("[A]lthough a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise, for an enterprise is defined by what it is, not what it does."). Even if Plaintiff's civil RICO claim were not barred by the statute of limitations, Plaintiff has failed to allege an enterprise necessary to sustain a RICO action.

6.     Conspiracy to Commit a RICO Violation, 18 U.S.C. § 1962(d)

Under § 1962(d), proof that Defendants by their words or actions "objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes," constitutes a conspiracy to violate RICO. *Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois*, 424 F.3d 659, 674 (7th Cir. 2005). To state a claim under § 1962(d), a plaintiff must allege:  (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals. *See Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 732 (7th Cir. 1998). Therefore, Plaintiff must sufficiently allege a conspiracy to violate RICO, or at least the existence of an agreement between Defendants to do so.

Because Plaintiff failed to sufficiently allege any type of RICO enterprise or connection between Defendants separate from the predicate acts themselves, no agreement could have existed. *See Stachon*, 229 F.3d at 677 ("Since Appellants fail to establish a violation of section 1962(c), their section 1962(d) claim based on the same facts must fail as well."). Because Plaintiff's § 1962(d) both falls outside the statute of limitations period and fails to allege a specific agreement between the Defendants, Plaintiff's § 1962(d) claim is dismissed.

## Count II - Violation of the Fourteenth Amendment's Equal Protection Clause, 42 U.S.C. 1983

1.    Statute of Limitations

In claims brought pursuant to 42 U.S.C. § 1983, federal courts adopt the forum state's statute of limitations for personal injury claims. *See Ashafa v. City of Chicago*, 146 F.3d 459, 461–62 (7th Cir. 1998). The appropriate statue of limitations for § 1983 cases filed in Illinois is two years. *Id., see also* 735 ILCS § 5/13-202 ("Personal Injury - Penalty"). Section 1983 claims "accrue when the Plaintiff knows or should know that his or her constitutional rights have been violated." *Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1992); *see also Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993) (holding that the statute of limitations begins to accrue on the date the plaintiff 'knows or should have known' that his rights were violated").

In this case, Plaintiff alleges that Defendants Village of Lemont, K.A. Steel, Piazza, Kwasneski, Jones, Antonopoulos, and Fielding conspired to, and did in fact, deny LDC the equal protection of the laws by: (1) failing to maintain the public highway accessing LDC's property in a condition safe for vehicular traffic, and (2) permitting K.A. Steel to maintain a guardhouse/weigh station capable of blocking traffic on the public highway accessing LDC's property. LDC claims that it was injured every day, continuously, from after the 1998 ruling of the Illinois Appellate Court (*Limestone II*), and after the conspiracy was entered into subsequent to November 1999, until 2004 when LDC entered into a contract to sell its property. Pltf.'s Res. to Lemont Def.'s Mot. Dis. at 8–9. Plaintiff claims that each day brought a "fresh wrong" that by itself is actionable under § 1983, many of which fall within the two-year limitations period. In the alternative, Plaintiff alleges that the Defendants' actions constitute a continuing violation that allows LDC to reach back and recover for all damages that occurred inside as well as outside the limitations period. *Id.*

Normally, the statute of limitations begins to run from the date of the injury; however, the continuing violation doctrine allows a Plaintiff to reach back to the beginning of a violation and recover for all damages even if that beginning lies outside of the limitations period. *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001) (allowing prisoner to use continuing violation to cover entire period in which he was denied medical care and suffered continuing injury). The doctrine applies only when it "would be unreasonable to require or even permit [a Plaintiff] to sue separately over every incident of the Defendant's unlawful conduct." *Id*. The doctrine also applies "when the earlier violation may be recognizable as actionable only in light of later events." *Pitts v. City of Kankakee, Illinois*, 267 F.3d 592, 595 (7th Cir. 2001). However, the doctrine does not apply "where the harm is definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress." *Wilson*, 956 F.2d at 743.

LDC acknowledged that the K.A. Steel guardhouse/weigh station existed and was fully operational, at the latest, in November 1999. Thereafter, there are no allegations of actual mistreatment or misconduct: LDC's Amended Complaint does not maintain that it was frequently denied access to its property, turned away or blocked at K.A. Steel's gate, or that K.A. Steel physically damaged the access road. Likewise, LDC's Amended Complaint against the Village of Lemont and its officials alleges solely that the Village failed to take any action to repair the road accessing LDC's property - not that Defendants took any affirmative action causing LDC injury. The refusal to undo the prior violation is not a fresh act affecting the running of the statute of limitations. *See Pitts*, 267 F.3d at 597 (The "refusal to undo a violation is not a 'fresh act' of discrimination, but instead is a persisting effect of past discrimination that does not affect the running of the statute of limitations.") The limitations period began to run when LDC knew or should have known of its injury - in this case, no later than November 1999.

Similarly, it is not unreasonable to require LDC to bring suit against Defendants Village of Lemont or Fielding when it knew of its injury in November 1999. LDC knew of the injury caused by the Village of Lemont and Fielding in April 1999 when it filed for a writ of mandamus alleging that the access road was not safe for vehicular traffic and that the Village of Lemont and Fielding failed to maintain the road consistent with the order of the Illinois Appellate Court in *Limestone II*. LDC acknowledges in its April 1999 mandamus complaint that "[d]ue to Lemont and Fielding's failure to perform their duty with respect to the Canal Road, the rights of Plaintiff and other members of the public have been materially harmed." Mandamus Compl. at ¶ 17, Def. Ex. 8. Therefore, because LDC knew it was injured in April 1999 and was not prevented from coming forward to seek redress—and in fact did come forward and file a mandamus action against the Village of Lemont—it is not unreasonable to require Plaintiff to file its suit within the two-year statute of limitations period for § 1983 actions.

Accordingly, Plaintiff's § 1983 claim accrued no later than November 1999 (when Plaintiff says its injury began) and its claim is not otherwise saved by the continuing violation doctrine. Therefore, because the Plaintiff did not file suit until August 1, 2005, well outside the two-year statute of limitations period for such actions in Illinois and this Circuit, Plaintiff's § 1983 claim is time-barred and must be dismissed.

### Count III – Tortious Interference with Business Expectancy and Conspiracy

Finally, LDC brings a supplemental state law claim for Tortious Interference with Business Expectancy and Conspiracy to Interfere with Business Expectancy as to K.A. Steel.[4] Because the

---

[4] Plaintiff conceded in its Response to the Lemont Defendants' Motion to Dismiss that Defendant Village of Lemont, and its employees, Defendants Piazza, Jones, Kwasneski, Antonopoulos, and Fielding should be dismissed from the tortious interference claim as falling outside the statute of limitations. *See* 745 ILCS § 10/8-101 (statute of limitations for civil actions against a local entity or any of the entity's employees is one year from the date of injury). Therefore, the Court dismisses Count III against these defendants and considers the claim solely against K.A. Steel.

Court has dismissed both claims giving rise to federal jurisdiction, the Court declines to exercise jurisdiction over Plaintiff's remaining state law claim solely against K.A. Steel.

## Conclusion

Count I of Plaintiff's Amended Complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because LDC's RICO allegations are time-barred and because Plaintiff fails to sufficiently allege a RICO enterprise. Similarly, Count II of Plaintiff's Amended Complaint is to be dismissed as to all Defendants for LDC's failure to bring suit within the statute of limitations period of claims brought pursuant to 42 U.S.C. § 1983. As both claims giving rise to federal jurisdiction have been dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claim brought solely against Defendant K.A. Steel. Accordingly, Plaintiff's Amended Complaint is hereby dismissed in its entirety.

So ordered.

Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: January 25, 2007